### In re HARWOOD.

(Third Division. Valdez. October 21, 1921.)

No. 20, Bankruptcy.

1. **Bankruptcy** ⬅100(1)—**Conclusiveness of Adjudication—Judgment.**
    The conclusiveness of an adjudication of bankruptcy seems to be a vague question under the law. The authorities are in hopeless confusion. Although an adjudication of bankruptcy concludes all the world as to the status of the debtor bankrupt, it does not bind strangers as to the facts or subsidiary questions of law on which it is based.

⬅See same topic '& KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Bankruptcy ⟨key⟩166(3)—Voidable Preferences—Chattel Mortgages.**

Harwood was indebted to various creditors in an aggregate amount almost or quite double the value of his assets. The agent of the Schwabacher Company, after a week's examination of his property and accounts, demanded and received a chattel mortgage upon his stock of goods to secure this creditor's claim. Within four months three other creditors filed their petition in bankruptcy against Harwood, and objected to the validity of the chattel mortgage as a voidable preference under the Bankruptcy Act. *Held*, the chattel mortgage was void as an unlawful preference under the provisions of section 60b of the Bankruptcy Act.

**3. Bankruptcy ⟨key⟩223—Costs—Referee Fees.**

A claim of a referee in bankruptcy for swearing witnesses and affixing his certificates to depositions taken by him disallowed. There is no provision of law for it in the Bankruptcy Act.

**4. Bankruptcy ⟨key⟩476—Costs—Witness Fees.**

Witnesses who are creditors of the bankrupt estate should not be allowed witness fees unless it is shown their testimony was taken elsewhere than in the town of their residence. The fees of the witnesses for the claimant should not appear in the cost bill because they were payable when taken by the claimant, and, as the decision was in favor of the trustee, the estate is not required to pay the same.

This is a summary proceeding in bankruptcy to determine the validity of a chattel mortgage as a preferred claim, the trustee of the bankrupt protesting against its allowance as a preferred claim on the ground that it was a voidable preference under the provisions of section 60b of the Bankruptcy Act (U. S. Comp. St. § 9644).

For several years prior to the filing of the petition in involuntary bankruptcy E. L. Harwood, the bankrupt, conducted a pool and billiard room in the town of Cordova, selling soft drinks, tobacco goods, fruit, candies, and other small articles. On September 4, 1920, he gave a chattel mortgage on most of his fixtures and stock to Schwabacher Bros. Company of Seattle to secure the amount of his past-due indebtedness to that company, in the sum of $4,480.42. This mortgage was duly filed in the proper recording office on the same day. Within four months thereafter, on December 31, 1920, a petition in bankruptcy was filed against Harwood by three creditors in this court, and in due course Harwood was adjudged a bank-

⟨key⟩See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rupt. The matter was referred to F. J. Hayes, referee in bankruptcy at Cordova. The Schwabacher Company, made proof of its chattel mortgage debt as a preferred claim. The preference was contested by the trustee as voidable on the ground that it had been given with knowledge, actual or imputed, on the part of the creditor that Harwood was bankrupt, and that the effect of the preference would be to give the creditor a larger percentage of its claim than other creditors of the same class. Counsel for the claimant objected to trying the issue before the referee because of his close business association with the attorneys for the trustee and nearly all the other creditors, and the matter came direct to the district court by stipulation, the testimony of Cordova witnesses being taken by deposition before the referee. Other depositions were taken in the state of Washington.

RICHIE, District judge. It is not seriously disputed that Harwood on the date of the chattel mortgage was indebted about $10,000. Proof of claims aggregating $9,761.84 have been filed with the referee, and the validity of these claims is not attacked. I think a fair estimate of Harwood's, assets at that time places them between $5,000 and $6,000.

Counsel for the Schwabacher Company contended that the issue of bankruptcy is before the court, as well as the issue of the company's knowledge or reasonable cause to believe Harwood was bankrupt. The conclusiveness of an adjudication of bankruptcy seems to be a vague question under the law. A leading text-book says, "The authorities are in hopeless confusion." The Supreme Court has held that, "although an adjudication of bankruptcy concludes all the world as to the status of the debtor qua bankrupt, it does not bind strangers as to the facts or subsidiary questions of law upon which it is based." Gratiot County State Bank v. Johnson, 249 U. S. 246, 39 Sup. Ct. 263, 63 L. Ed. 587.

However, it appears to me that the evidence that Harwood was insolvent when he gave the chattel mortgage is so conclusive that the question is not a tangible issue in this proceeding, even if it can be raised. The only question to determine, then, is the Schwabacher Company's actual or imputed knowledge of the insolvency when it took the chattel mortgage.

It is admitted that Roy G. Hersh, agent for the company, came to Cordova a few days before the mortgage was given

and held several conferences with Harwood. He also talked to other persons, including at least one other creditor with a large claim. The testimony as to these conversations is somewhat conflicting, but coincides in some statements. Hersh admits that his company's claim was much overdue, and that he and his company were anxious about it and for several months had been trying persistently to collect at least part of it; that further credit had been refused Harwood several months before. He admitted he was "around Harwood's place for six or eight days before this mortgage was given." He stated that he and Harwood made a sort of informal inventory of the fixtures and stock in the place by walking around and making estimates, and that they estimated a total of value of about $10,000. He denied that he received any information in Cordova that led him to believe Harwood was insolvent. He said Harwood put his indebtedness at about $6,300 in their discussions.

E. Morganstern testified by deposition in Seattle that he was assistant treasurer of the Schwabacher Company and in charge of its credits. He corroborated Mr. Hersh in the latter's statements as to attempts to collect or reduce Harwood's indebtedness to his company, and that Harwood had been refused further credit. He denied that his company believed or had reason to believe Harwood was insolvent when he gave the mortgage. He offered in evidence a report from Oak Olson, former representative of the company in Alaska, dated August, 1919, and one from Bradstreet's the same month, each reporting on Harwood as though he were solvent, though considerably indebted. These were finally admitted without objection. He admitted that he had consulted very little with other Seattle wholesale houses about Harwood and knew very little about other claims.

George C. Hazelet, owner of the building occupied by Harwood for his business, testified that in the latter part of August, 1919, he met Mr. Hersh in Harwood's pool room, and they discussed Harwood's financial condition, and that he told Hersh that Harwood owed him between $1,500 and $2,000 for rent. He testified also that Hersh said he was "going to have a show-down with Harwood." Hazelet said further that he and Hersh discussed Harwood and his debts generally. Mr. Hersh admits that he had the conversation with Mr. Hazelet, but did not think he said everything testified to by Hazelet.

C. M. Rosswog, a business man of Cordova, testified that about the same time Hersh talked to him about Harwood's financial condition and made the statement "that Harwood was in a bad way financially," and "that he [Hersh] was going to protect his company." Mr. Hersh testified that he was unable to remember making this statement to Rosswog.

Gustav Gelles testified that he is a merchandise broker representing several wholesale houses in the states; that he visited Cordova and other Alaska towns about every six weeks; that he had done business with E. L. Harwood; that he was familiar with the financial condition of Harwood in the summer of 1920, before and after Harwood gave the chattel mortgage in question, and that Harwood was commonly considered insolvent, and that fact was common talk around Cordova; that the National Grocery Company, represented by witness, "had ceased to do business with him on open account for almost a year prior because we considered him insolvent." He also testified that Harwood's insolvency had been common repute among Seattle wholesale houses for many months previous.

The definition of insolvency given by Mr. Gelles in his testimony is not strictly accurate, but in view of his business and means of knowledge I think his testimony that Harwood owed more than his property was worth is entitled to considerable weight.

E. L. Harwood, the bankrupt, gave his deposition at Walla Walla, Wash. He testified when he gave the chattel mortgage to Schwabacher Bros. he owed about $5,380 to other creditors. He estimated the value of his property at about $5,500. He gave in substance the following account of the discussions with Hersh which resulted in his giving the chattel mortgage:

"During the months of June, July, August, and September, 1920, the Schwabacher Bros. & Co., through their representative, Mr. Olson, made a great many demands upon me for payments, I would say about six or seven times, and in the month of September, or the latter part of August, I am not certain which, but it was the same time that I gave the chattel mortgage, Mr. Roy G. Hersh appeared as representative for the Schwabacher Bros. & Co. and made demand upon me for a substantial payment, and at that time Mr. Hersh inquired of me what other creditors I had, and I told him the names of each creditor I owed and the amount I owed each, the same as answered in interrogatory No. 13. The day that I signed the mortgage to Schwabacher Bros. & Co. I was advised by Mr. Hersh, as their representative, that he had been fooling

around with me for about a week, and unless I gave him a chattel mortgage on everything I had that they would close me up and put me out of commission, and, in order to avoid being closed up, I gave them the mortgage."

Harwood said further that he told Hersh that, if he gave Schwabacher a chattel mortgage, the other creditors would throw him into bankruptcy, but Hersh said that such action would make no difference to them; that, if Harwood did not give him the chattel mortgage, he would close up the place. After going over the situation for several days, Harwood finally signed the chattel mortgage, according to his statement, under the high pressure put upon him by Hersh.

Allowing for the possibility that Harwood may be slightly hostile to the Schwabacher Company because he may feel that the company and its agents are responsible for his financial collapse, I am satisfied that his testimony is substantially true. His statement as to his liabilities is not challenged, and I believe his estimate of his property holdings at about $5,500 is all they were worth at the time. It is fair to say that Hersh denies some of Harwood's statement about their conversations. He denies that he told Harwood he would close him up if the mortgage was not given. He testified as follows:

"Mr. Harwood did not want to sign this mortgage. I said to him, 'If you don't sign it, you will be sorry.' He deliberated a while and then signed it."

Hersh said that he could not remember that anything was said about Harwood's other creditors putting him into bankruptcy.

Considering all the evidence given, I cannot avoid the conclusion that, if Schwabacher Bros. & Co. and Mr. Hersh did not know that Harwood was insolvent, they were grossly negligent in the matter of informing themselves. It seems to me that it was almost notorious that Harwood owed much more than the value of his property at any reasonable valuation, and that every person interested ought to have known or could easily have ascertained the fact. The conclusion is unavoidable that the Schwabacher Company had reasonable cause to believe that Harwood was insolvent and that the chattel mortgage, when given, was a voidable preference.

In arriving at the conclusion that Harwood's property was worth about the amount that he places upon it, at a fair val-

uation, I do not take his own estimate as conclusive, but a careful reading of his statement in connection with the other testimony leads me to believe that is a fair statement. The only witnesses who put the value of his property higher are Mr. Hersh, who, as already stated, testified that he and Harwood estimated his fixtures and stock at $10,000, and Mr. E. V. Boyle, of Cordova, who as a witness, gave estimates of the larger fixtures which would put their value much higher than any other witness except Mr. Hersh.

E. P. Harwood, son of the bankrupt, was one of the appraisers and testified in the case as to the value of the property, among other facts. The trustee offered the appraisement as evidence of the value of the property, but it was excluded as incompetent, but E. P. Harwood, as one of the appraisers, was permitted to refer to it to refresh his memory, and he testified that the amount of the appraisement, to wit, $5,657.53, was, in his opinion, at the time it was made, a fair valuation. The other appraisers did not testify.

The trustee has sold all the property of the bankrupt at private sales for sums aggregating $3,125.73. The admissibility of the trustee's report of his sales as evidence of the valuation of the property was challenged by the claimant, but was admitted, after a basis for its reception was laid by showing that business conditions in Cordova and along the southwestern coast of Alaska had not substantially changed between the date of the chattel mortgage and the sales, which were only a few months later. Mr. Hersh had testified in his deposition that conditions were very much better on the date of the chattel mortgage than they were the following winter and spring when the sales were made. Mr. Donohoe, one of the attorneys for the trustee, testified that in his opinion conditions were slightly better when the sales were made than in September previous, giving his reasons. It is my opinion from the evidence that the conditions in Cordova at the time of the sales were not quite so favorable as when the mortgage was given, but the difference, if any, was not substantial. I do not attach much weight to the amount of the sales as fixing the value of the property, but I think it was admissible. Mr. Gelles testified that he thought the property was worth between $4,000 and $4,500. I reiterate, therefore, that I think Harwood's own estimate of about $5,500 was high enough.

It follows that the chattel mortgage in question must be held to be a voidable preference under section 60b of the Bankruptcy Law, and the note it secures be disallowed as a secured claim, but that it be allowed as an unsecured claim, entitled to share pro rata with other secured claims in the distribution of the estate.

The cost bill submitted by the referee cannot be allowed. In the first place, some extra cost was made in this proceeding because of the possible disqualification of the trustee to pass upon the question involved. That made it necessary to take depositions to be sent to the district court. If the matter had been heard before the referee, the only charge for testimony that could be allowed under the Bankruptcy Act is that provided in section 38 of the Bankruptcy Act, which provides that the referee may "upon the application of the trustee during the examination of the bankrupts, or other proceedings, authorize the employment of stenographers at the expense of the estates, at a compensation not to exceed ten cents per folio for reporting and transcribing the proceedings." It is true that this proceeding has been made necessary by the attempt of the Schwabacher Company to assert an untenable claim, but no further cost should be imposed upon the unsuccessful claimant than is entailed by its action. As already stated the expense of depositions was made necessary by the stipulation to send depositions to the district court, so no further costs should be imposed upon the claimant than would have been necessary if the testimony had been taken before the referee for his use. In fixing the amount at the rate which would have been paid under the Bankruptcy Act for taking testimony in ordinary proceedings before the referee, I am persuaded by the following statement from the Circuit Court of Appeals of the Seventh Circuit in Re Curtis, 100 Fed. 784, 792, 41 C. C. A. 59, 68:

"The present act, so far as it specifies the amount of fees of officers whose services may be required in execution of the law, fixes them at a low figure, possibly much lower than is compensation for the service; but it is not for us, for that reason, to disregard the law, or seek to thwart the design of Congress, however inadequate we may think the compensation allowed."

I think the doctrine and policy laid down in that dictum of Judge Jenkins ought to govern all bankruptcy proceedings in the matter of costs.

The claim of the referee for swearing 'witnesses and his certificates to the depositions taken by him is disallowed. There is no provision for it in the Bankruptcy Law.

I do not think witnesses who are creditors of the estate should be allowed witness fees unless it is shown their testimony was taken elsewhere than in the town of their residence. C. M. Rosswog, not being interested in the event of the proceeding, should be allowed witness fees. This, and the cost allowed by law for taking depositions in a bankruptcy proceeding, will be taxed against the claimant. The fee of J. L. Simkins as witness for the trustee cannot be charged against the claimant because his testimony was incompetent. The fees of witnesses for the claimant should not appear in the cost bill because they were payable when taken by the claimant, and, as the decision is in favor of the trustee, the estate is not concerned in the payment of claimant's costs and expenses.

The allowance of 10 cents a folio for the depositions taken before the referee is only for the testimony, without certificates or stipulations. The allowance for the deposition of E. L. Harwood taken elsewhere should include its entire contents.

The compensation of the referee fixed by law is plainly stated to be intended to cover all his services and all his expenses, except when provision is made for them specifically.

⬖See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes